# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-802

**STATE OF LOUISIANA**

**VERSUS**

**MICHAEL ANDRE THOMAS**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 8321-20
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

**GARY J. ORTEGO**
**JUDGE**

\*\*\*\*\*\*\*\*\*\*

Court composed of Shannon J. Gremillion, Charles G. Fitzgerald, and Gary J. Ortego, Judges.

**AFFIRMED.**

**Hon. Stephen C. Dwight**
**Fourteenth Judicial District Attorney**
**P. O. Box 3206**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF APPELLEE:**
     **State of Louisiana**

**Chad M. Ikerd**
**Louisiana Appellate Project**
**P. O. Box 2125**
**Lafayette, LA 70502**
**(225) 806-2930**
**COUNSEL FOR DEFENDANT APPELLANT:**
     **Michael Andre Thomas**

**David S. Pipes**
**Assistant District Attorney**
**Fourteenth Judicial District**
**901 Lakeshore Drive**
**Lake Charles, LA 70601**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF APPELLEE:**
     **State of Louisiana**

**ORTEGO, Judge.**

On June 18, 2020, Defendant, Michael Andre Thomas, was charged by grand jury indictment with two offenses, the second-degree murder of Timothy Wayne Napoleon, in violation of La.R.S. 14:30.1, and the attempted second-degree murder of Crystal C. Jones, in violation of La.R.S. 14:27 and 14:30.1. On June 11, 2021, a unanimous jury found Defendant guilty as charged on both counts.

On June 24, 2021, Defendant filed a motion for new trial, contending the verdicts were contrary to law and evidence and that the ends of justice would be served by the granting of a new trial. A hearing was held on Defendant's motion on August 4, 2021, at which the trial court denied the motion. On August 6, 2021, the court sentenced Defendant as follows:

> For the death of Timothy Napoleon, I hereby sentence Michael Thomas to life imprisonment at hard labor without the benefit of probation, parole, or suspension of sentence.

> For the attempted second-degree murder of Crystal Jones, for depriving her freedom, for paralyzing her, for forcing her into a catheter for the rest of her life; for the ruthlessness of which he committed such crime, for the lack of remorse, I sentence Mr. Thomas to 50 years without benefit - - 50 years of hard labor without benefit of probation, parole, or suspension of sentence. That time to be concurrent to the second-degree murder, life imprisonment.

On August 9, 2021, a "Motion to Reconsider Sentence" was filed on Defendant's behalf which contended "the sentence imposed upon him is excessive."

Defendant now appeals his convictions and sentences, contending that the evidence produced by the State was insufficient to prove that he was not acting in self-defense or, alternatively, that he should have been convicted of the lesser offense of manslaughter against Mr. Napoleon and aggravated battery upon Ms. Jones.

For the following reasons, we affirm Defendant's convictions and sentences.

1

## ERRORS PATENT:

In accordance with La.Code Crim.P. art. 920, we review all appeals for errors patent on the face of the record. We have reviewed the record, and it reveals no errors patent.

## FACTS

Given that Defendant's first assigned error claims insufficient evidence, we start by summarizing the evidence presented to the jury.

The offenses for which Defendant was convicted occurred on or about 6:20 p.m. the night of January 7, 2020. The shootings originated between Defendant's Lake Charles residence and his converted backyard garage, where Defendant and Ms. Jones had together operated a modest second-hand "store" before Ms. Jones broke off their relationship shortly after Thanksgiving. Defendant and Ms. Jones had previously known each for twenty-five years and cohabited for about thirteen years and at this home for two years.

The evidence presented to the jury included firsthand testimony of the shootings by the only two surviving eyewitnesses, Defendant and the surviving victim, Ms. Jones.

In addition, testimonial and other evidence was received from law enforcement personnel involved with the incident, both contemporaneously and later, and from the parish coroner, whose expertise was stipulated by the parties.

The State's documentation was extensive and included contemporaneously recorded videos and audio archives and transcripts, including those taken of Defendant a few hours after the shootings, after receiving *Miranda* warnings, and including a recorded telephone conversation that same night between Defendant and an acquaintance that he contacted to arrange for the pick up of his car and other

2

possessions. Both recordings contained admissions by Defendant with respect to his intent to harm alleged victims, Timothy Napoleon and Crystal Jones. Other than Defendant, who testified last, each of the witnesses were called by the prosecution. These included members of the Lake Charles Police Department, Ms. Jones, and the Calcasieu Parish Coroner.

### Officers Baccigalopi and Clouse

The State's first witness, Officer Dakota Baccigalopi, a patrol and part-time SWAT officer with the Lake Charles Police Department, testified that on January 7, 2020, he was dispatched to the 2300 block of Tulip Street in response to a call regarding a gunshot victim, later identified as Mr. Napoleon, laying in the road, and possibly another victim, later identified as Ms. Jones.

After rendering aid to Mr. Napoleon, Officer Baccigalopi assisted another officer, Officer Clouse, in apprehending Defendant. His account was corroborated by a video recording taken by Officer Clouse's body-camera. This video shows Defendant being directed to walk backwards with arms raised toward the officers until Officer Baccigalopi handcuffs him.

### Officer Whalley

The State next called three-and-a-half-year veteran Patrol Officer Silus Whalley. Officer Whalley testified that when he arrived at the scene, two officers directed him to a man identified as Mr. Napoleon, to whom he rendered emergency first aid until paramedics arrived and took over. His account was corroborated by his body video camera showing Officer Whalley and a female officer rendering aid to Mr. Napoleon for roughly eight minutes before the paramedics arrived, and Officer Whalley could be heard to say he no longer felt Mr. Napoleon's pulse immediately before paramedics arrived and left with Mr. Napoleon.

Officer Whalley then moved to where Ms. Jones was located behind Defendant's house. As Officer Whalley approached, Ms. Jones could be heard to say she could not feel anything, she could not squeeze Officer Whalley's hand, and she could not breathe. She further can be heard asking to die.

Officer Whalley and other officers helped the paramedics secure Ms. Jones to a back-board, then into an ambulance to be transported to a hospital.

### *Officer Howell*

The State next called Kristen Howell, an evidence officer with the Lake Charles Police Department, tasked with processing and preserving evidence to be introduced into the record, including twenty-three photographs she took at the crime scene. These photos showed the layout of the crime scene near the house, including the position of three spent .45 caliber casings between the house and the out-building "store," which were introduced into evidence.

Additionally photographs of Mr. Napoleon, taken at the hospital, were introduced to illustrate the location of the entry wound in his chest and the exit wound on his lower back.

### *Detective John Russell*

The State's next witness was Detective John Russell, a twenty-one-year veteran of the Lake Charles Police Department who was also assigned to the shooting the evening of its occurrence. At the scene, he was informed there were two victims, one of which had already been confirmed dead.

When he first arrived, his colleagues informed Detective Russell that no weapons were found on the victims and, after further investigating, he could find "no evidence at all" to suggest that either Mr. Napoleon or Ms. Jones had committed a crime prior to when they were shot by the Defendant.

## *Defendant's Post Miranda Interview*

The State next introduced a video recorded interview given by Defendant to law enforcement shortly after the shooting, which was then published to the jury. Defendant was read his *Miranda* rights, then signed the Miranda rights form, both clause by clause and at its conclusion. Defendant then consented to speak with the two interviewing law enforcement officers at 10:04 p.m, about three-and-a-half hours after the first dispatch. This recorded and transcribed interview began with Defendant providing, from memory and without delay, his address, phone number, and Social Security number.

Defendant first stated that he believed Ms. Jones and Mr. Napoleon came to his house to rob him. When asked why, he said because they were "dope fiends."

Defendant then described how Ms. Jones had broken off their relations shortly after Thanksgiving, how Mr. Napoleon had previously threatened him when Ms. Jones brought Mr. Napoleon to Defendant's home, and how after their breakup Ms. Jones would still come to the house periodically to pick up her belongings or to wash clothes.

Defendant said that at first he went out of his way to be nice to Mr. Napoleon, who at first had been nice to him.

Turning to the events earlier that evening, according to Defendant, Ms. Jones called looking to collect her $40 share from a washer and dryer he had sold and told him they would come right over. Defendant also acknowledged that he had asked to buy a gram of marijuana from Mr. Napoleon, who agreed to sell it to him. After the two arrived, Ms. Jones showed the "store" to Mr. Napoleon.

From Defendant's initial account, it would appear that originally nothing seemed amiss on the day of the shooting. Defendant stated that Ms. Jones wanted

Mr. Napoleon to see what Defendant had in his "store" and that he knew Mr. Napoleon was also coming. Defendant stated that when Ms. Jones and Mr. Napoleon arrived, "they were cool," and they came around to his back porch, where he was to talk to them. When Ms. Jones asked if Mr. Napoleon could see the "store," Defendant recounted to his police interviewers that he had no objection, responding "Yeah, I don't care. Know what I'm saying? He can see that 'store' shit, that shit don't mean nothing to me."

Shortly afterwards, however, events spiraled. According to Defendant, what precipitated the shootings was a comment and alleged actions taken by Mr. Napoleon when Mr. Napoleon told Defendant that he "wanted it all." Defendant's account of it was that the larger Mr. Napoleon was "right here in my motherfxxxing face, man," when he said these words and ordered Defendant to "give it up," at which point Defendant "start[ed] shooting they motherfxxxing asses."

Defendant's account of events during the one-hour interview were not wholly consistent.

At some points he said the ill will between himself and Mr. Napoleon caused him to fear for his life, explaining his recent decision to purchase the gun "in the hood." At other times he sounded fearless, once saying with bravado "I wanted to kill both of them."

While acknowledging he had a gun and fired it more than once, the gun he fired was not found the evening of the shooting. Defendant agreed to identify a gun similar to the one he used from a chart, then casually asked, "The one I shot them motherfxxxers with?"

This was not Defendant's only admission the night of the shootings. At another point, Defendant stated he shot the victims "as soon as they came out [his]

6

garage." He described the incident as "Bam, bam, bam niggx. I'm fixin to eat y'all asses up, motherfxcker! YEAH, hell yeah." He then stated "I wanted to kill'em. I wanted to kill'em, man."

Defendant stated he believed he shot Ms. Jones first, then when Mr. Napoleon took off running, and he shot at Mr. Napoleon twice. He then stated he did not really want to shoot Ms. Jones, but that "bxtch should have never had that niggx over at my motherfxxxing house in the first place." When asked what Ms. Jones did after being shot, Defendant stated she was crying out for help, to which he responded "bxtch, shut up."

At another point, Defendant said he was not sure that he hit Mr. Napoleon, but he "was sure hoping to."

While discussing the documents related to the permission to search his phones, Defendant said he did not want to read it, claiming he was "ready for this life sentence. You know, so I can go to sleep."

Defendant vacillated over whether he moved his car or left it where it was after the shootings, blaming it for the first time on consuming "maybe a pint of vodka". He then interjected that "I remember when I was shootin' at them motherfxxxers, I can tell you that." He stated he then "stayed there and waited for the police to come."

Defendant stated Mr. Napoleon ran around the side of the house while Defendant shot at him. Defendant stated he did not know how many rounds the gun held, claiming that he had only had it for about three days prior to the shooting and stating he bought the gun with bullets already in it.

When asked if he bought the gun for the sole purpose of shooting Mr. Napoleon, Defendant nodded his head "yes" before again claiming it was for his

protection. He again stated, "I wanted to kill these motherfxxxers, man, you know what I mean?" Defendant admitted he asked Ms. Jones and Mr. Napoleon to bring him some weed, although he never saw any.

When asked for his reasoning in shooting Ms. Jones, Defendant could only say that when Mr. Napoleon said he wanted it all, "Shxt niggx I'm fixin' to kill you motherfxxxers, man. I wanna kill you motherfxxxers, niggx." While discussing disrespect rather colorfully with law enforcement, Defendant stated he should have killed Mr. Napoleon a long time ago. When law enforcement noted that Defendant invited Mr. Napoleon over to "mow his ass down," Defendant simply nodded his head in agreement. After again saying Mr. Napoleon "wanted it all," Defendant stated he was "waiting to kill these motherfxxxers."

Defendant acknowledged that he never saw Ms. Jones or Mr. Napoleon produce any kind of weapon.

Later in the interview, Defendant's tone shifted considerably after being told Mr. Napoleon died in the shooting later in the interview.

### *Defendant's Telephone Admissions*

The State's next witness was Lieutenant Roy Malone, a twenty-six-year veteran of the Calcasieu Parish Sheriff's Office as its "facility security officer," which placed him in charge of "the video of all the facilities" and "access to the jail phone calls."

Following his post *Miranda* interview the night of the shooting, Defendant was permitted to make a call on January 8, 2020, in part to request someone to pick up his possessions.

The recording of the jail call was played to the jury. At its beginning, the recording clearly provides notice to the caller, Defendant in this case, that "All phone

calls are subject to monitoring and recording." Nevertheless, Defendant immediately told the woman on the other end of the line that he had been charged with second degree murder and attempted second degree murder, that he had shot both Ms. Jones and Mr. Napoleon, and in response to the other party's apparent surprise, Defendant made such remarks as "Yeah, I killed them motherfxxxers, on my mama," and "I got them motherfxxxers, man." When asked whether Ms. Jones was in the hospital Defendant replied, "Oh yeah, they said she fxcked up." He also stated he "wanted both of them motherfxxxers, man. I ain't bullshxtting," and that he was alright now, noting he had a "permanent roof."

When the woman asked Defendant if "they came to your house and tried to rob you?" Defendant responded, "Hell yeah, that's my story." Defendant subsequently stated that if he had to do it all over again, he "would do it all-over motherfxxxing again." He repeatedly stated that he did not "give a fxck" about the trouble he was in.

### Detective Willie Fontenot

The State also called Detective Willie Fontenot, an eleven-year veteran of the Lake Charles Police Department with eight years as a detective, who also responded the night of the shootings to assist with the investigation. He likewise found no evidence that Mr. Napoleon was trying to rob Defendant, but rather that Defendant had invited "his ex of thirteen years over" for her share of an appliance sale, and to have "Mr. Napoleon bring some marijuana as well."

### Crystal Jones

The State next called Ms. Crystal Jones, who testified that she was born and raised in Lake Charles and had known Defendant for twenty-five years before moving to a nursing home as a result of her shooting related injuries.

Ms. Jones testified that by Thanksgiving 2019, their relationship had grown "rocky," leading her to break up with Defendant. Working as a cook at a restaurant in Lake Charles, she befriended and started dating co-worker Mr. Napoleon right after Thanksgiving. She testified that after she moved out, she periodically collected her personal items from Defendant. She had a small car, so she could not carry a lot at one time.

Ms. Jones testified that on the day of the shooting, Defendant had called her. She chose not to answer, but then Mr. Napoleon suggested she call back to see what Defendant wanted, and she did. Ms. Jones said Defendant had called to tell her she could come collect money he had for her from the sale of a washing machine previously purchased with her own money, plus her dog, since he was getting ready to move out of state. According to Ms. Jones, Defendant then called again to ask if Mr. Napoleon had any marijuana. She gave the phone to Mr. Napoleon, who after speaking to Defendant, turned to Ms. Jones to say "I'm gonna go with you." Until then, Ms. Jones had intended to drop Mr. Napoleon off at his sister's house and go alone to pick up the money and dog.

According to Ms. Jones, Mr. Napoleon was driving and parked her car behind Defendant's Cadillac. Defendant was not outside, so she called to let him know she and Mr. Napoleon had arrived. She testified that Defendant asked her to come inside, which she found a little unusual because Defendant had never invited both of them inside before. Ms. Jones testified that Mr. Napoleon was interested in buying a go-kart for his son that Defendant had for sale, and Defendant said he would give him a good deal when he was ready to buy it.

Defendant had been having trouble selling some women's jewelry, Ms. Jones testified, so Defendant invited her and Mr. Napoleon to come inside his "store" to

remove the jewelry. Once inside the two-room "store," Defendant showed Mr.

Napoleon around briefly, then Ms. Jones and Mr. Napoleon gathered up three pieces

of jewelry to bring to her car, but once they got outside the garage, one of the pieces

of jewelry Mr. Napoleon was carrying "came aloose and fell to the ground." Ms.

Jones testified that she and Mr. Napoleon then "both bent down to pick it up." This

is when the shootings occurred. Here is the testimony she provided to the jury about

the shooting:

> So, once Tim dropped the fixture, we both bent down to pick it up -- cause it was earrings on it so we was picking up the earrings and – because it fell. And, as we raised up, that's when he shot Tim. He shot Tim in the chest and all I saw was smoke coming out of his chest. And then Tim turned running.' He got a ways, a little bit, in the yard -- in a neighbor's backyard. He took off some, and then I turned to take off after I looked at Mike, and when I turned to take off, he shot me in the side.

> And then he stood over me with that gun pointed at my face, but then he saw Tim moving or something. Cause then he left -- he got away from me and he went to Tim -- I assume that's what he did – I'm just making assumptions cause all I heard was another pop, like another gunshot. So I just assumed that he went after Tim again. And then he comes back toward me and he looks at me with this weird look on his face, but he didn't point the gun back at me. He decided to jump in the car.

> So his Cadillac -- he had a little, bitty Ford truck parked by the garage door, and then it was his Cadillac, and then it was my car. So he decides to jump in the Cadillac and he was coming towards me, but then the police showed up and told him -- for him to get out the car. At first, he hesitated and I just -- I just thought he was gonna speed up just run over me, but he didn't. They -- and they got him out of that car before he could do anything else.

> Q..After they got him out of the car, what do you remember thinking while you're laying on the ground?

> A. That he's gonna come back and kill me.

> Q. Did you think you were gonna live?

> A. No. No, not at all.

11

Ms. Jones said she believed the bullet fractured her vertebrae, and pierced her liver. She was told she would never walk again. She was in a wheelchair when she testified, and she identified Defendant in open court.

On cross examination, Ms. Jones testified that Defendant was upset "in the beginning" after she told him she was moving out after thirteen years of living together, and that she and Mr. Napoleon had been to Defendant's house "[p]robably more than five" times after she started dating Mr. Napoleon.

Ms. Jones testified she lived with Defendant on Tulip Street for about two years, and that Defendant pretty much always kept a little "store." Ms. Jones testified that she never heard Mr. Napoleon say anything to Defendant about wanting stuff in his "store" before being shot.

### *Dr. Welke, Coroner*

The State's final witness was the Calcasieu Parish Coroner, Dr. Terry Welke, who Defendant stipulated to be an expert in forensic pathology. Dr. Welke performed an autopsy early on the afternoon of January 8, 2020. Dr. Welke concluded that Mr. Napoleon died of a gunshot wound which entered his chest and exited above his left buttock.

> The entrance wound was on the left frontal chest and it entered -- it entered there and then exited above the left buttocks. So the trajectory is from front portion of the body to the back portion of the body, and then it's called from left to right. So it's left portion of the body towards 'the right portion of the body. And then, also, it's -- and the manner is downwards. It was a sharp, downward trajectory, so that was consistent with – when someone says -- talks about trajectory, what you have to do is imagine if someone were to take a` spear and run it through a body.

Dr. Welke's detailed testimony described the condition and position of Mr. Napoleon's entrance and exit wounds, after which he concluded that the trajectory of the bullet meant that Mr. Napoleon was shot at a downward angle, consistent with

a scenario in which Mr. Napoleon may have been bending down when he was shot as follows:

> Q. Let me ask you this: If I were holding something, say jewelry, and I were to drop it and I'm picking it up as I'm shot, would that be consistent with the injuries that You see in Mr. Napoleon?
>
> A. Yes, sir.

We concluded that Dr. Welke's testimony was supported by the photographic evidence presented to the jury and by Ms. Jones' sworn testimony.

### *Defendant's Trial Testimony*

After the State rested its case, Defendant then took the stand in his own behalf. Defendant testified that he was born in Kansas City, Kansas; moved to Oklahoma City as a young child; and dropped out of school in the twelfth grade while living in Altus, Oklahoma. According to Defendant, he met Ms. Jones while he was serving a ten-year sentence in Colorado for either kidnapping or assault. Defendant described the circumstances of the charges as resulting from an argument between himself and his girlfriend when she got out of a car at a redlight and him driving off with her child in the car. Defendant claims he drove to his brother's apartment complex, got out the car and took off running not knowing the child was in the car. According to Defendant, he spent ten years incarcerated for the kidnapping, during which time he married this girlfriend while he was in prison, and they divorced after he was released from prison. Defendant said he was also charged with kidnapping in Oklahoma and eventually pled guilty to a lesser assault charge, for which he served two or three months. On the stand, Defendant also acknowledged being arrested for an incident with Ms. Jones in Texas in which he claimed to have thrown

a basketball that hit a shelf, causing a hammer to fall and hit her in the head while they were arguing.

Defendant claimed he was depressed when Ms. Jones left him. According to Defendant, Ms. Jones told him after Thanksgiving that she was leaving to find a new place after she had gone out of town with Mr. Napoleon and that she told him, "Thanksgiving was the first time that they had ever messed around and stuff." He testified he thought she was joking when she said she was leaving, but she left and was gone for about a week before coming back with Mr. Napoleon and one of his relatives to get some of her things. Defendant testified things were fine until he refused to give Ms. Jones the title to her car until she transferred the utility bills from her name to his since she had moved out. He stated at that point, Mr. Napoleon started cursing him and demanding the title to the car.

Defendant testified Mr. Napoleon threatened to "'F' [him] up" and that he would "come drag [Defendant's] ass from up there right now." Ms. Jones told everyone to calm down and they left. Defendant testified Ms. Jones came by his house five or six more times and that he told her not to bring Mr. Napoleon. He stated Mr. Napoleon came to his house three more times without ever getting out of the car.

Defendant then claimed that on one occasion, when the couple came to get a pair of air conditioners that belonged to Ms. Jones, Mr. Napoleon's son played on a go-kart at the "store," and Ms. Jones played with her dog. Then Defendant told Mr. Napoleon that Defendant was "good people" and Mr. Napoleon surprised him by telling him he knew everything about Defendant.

According to Defendant, on one occasion when he told Ms. Jones she needed to get her stuff so nothing would happen to it, Mr. Napoleon snapped, yelling and

threatening to "light you up and everything back here." Defendant believed it was to intimidate him, and said he already felt intimidated by Mr. Napoleon's tattoo and greater physical size. Defendant stated he was not sure how much prison time Mr. Napoleon had done, but that Mr. Napoleon claimed he had spent twenty-eight years in prison.

According to Defendant, Ms. Jones initiated contact with him on the day of the shooting. He denied telling her to bring Mr. Napoleon, but admitted that he was going to give her forty dollars for the washer and ten dollars for marijuana, claiming "she had real good weed."

Defendant, when asked about his state of mind when Ms. Jones was coming to his house, said he "was cool." According to Defendant, he had been drinking and "might've drunk about a pint [of vodka] that day." He testified he was scared to live in his house because of Mr. Napoleon, so he went looking for a gun and "somebody sold [him] one."

Defendant testified that his gun was in the house, but he put it in his pocket when he heard "a man's voice" outside that day. According to Defendant, when he came outside, Mr. Napoleon was already looking through his "store," which he claimed was locked.

According to Defendant, when he came outside, he also stated Ms. Jones could take whatever she wanted "cause it was going to the trash anyway, all [Defendant] couldn't take with [him]." Defendant claimed he was trying to move to either Texas or Oklahoma with his sisters. Defendant testified:

> Q. Where was the gun when they showed up?
>
> A. When they showed up, it was in the house. But she was supposed to be showed up by herself. I didn't -- I didn't get that gun til I heard a man's voice out there.

15

Q. And what'd you do with it?

A. I put it in my pocket.

Q. Where were you when they showed up?

A. I had just went -- she came back to the backdoor by herself. I only seen her at first, and then I went in the house cause I wanted to get her her mail, and then I was taking a -- I was taking a leak and then I went to go back out to give it to her. And when I heard a man's voice, you know what I'm saying, I came out there and I had my gun in my pocket. And then I heard -- I could hear him say, damn, he got it going on like this out there? And then she say, can he see the inside of your store? I said, yeah, right, he already in there, ain't he? And then they was looking –

Q. Okay, let's back up a little bit. When you came out of the house, where was Tim Napoleon?

A. He was in my store.

Q. So it was not locked?

A. No, it wasn't locked at all.

Q. And he was inside?

A. Yeah, cause she had asked me, could she go get some jewelry or a handbag or something that she wanted out of the store, so yeah, you can go -- you can go get whatever -- whatever she wanted out there, she could have it cause it was going to the trash anyway, all I couldn't take with me. I didn't want none of the stuff no more, so I was -- she could have whatever.

When asked what happened next, Defendant claimed:

He -- I guess waiting on me to respond. He said give it up, little niggx. He said -- then he said you ain't gonna make it back to that back door -- cause I'm sitting up right there by my backdoor -- by my backdoor, sitting up on my stool and stuff. I wanted to run, you know what I'm saying, but I had that gun in my -- in my pocket. I didn't want to accidentally trip and -- and fall and hurt myself and shoot myself. But when I was fixin' to run, that's when he started coming toward me. And that's when I pulled out the pistol and I started shooting.

16

Defendant claimed Mr. Napoleon tried to change directions and run away once he saw the gun. He testified the porch was about seventeen inches off the ground. Defendant then claimed Mr. Napoleon might have already been shot when he turned and ran. Defendant then claimed he "had to have stepped off that porch" before firing any other shots. When asked at trial if he tried to shoot Ms. Jones, Defendant claimed he "really didn't try to shoot Crystal." When asked about his radically different statement in his interview, Defendant claimed he "was delusional, delirious," "[i]n a state of shock." Defendant again claimed he "was just high, drunk" and did not remember what he told law enforcement.

Defendant acknowledged telling Ms. Jones, "Bxtch, shut up" after shooting her. Defendant claimed he was mad because if she had not brought Mr. Napoleon to his house, Defendant "would've never been in this trouble." He then reiterated that he did not want to shoot Ms. Jones because if he did, he would have killed her.

After testifying that he was only about three inches from his backdoor, Defendant claimed he was not sure if the door was locked or unlocked because he could not "get it to go inside." Defendant claimed that he was scared because Mr. Napoleon should not have been at his house, testifying that he "never invited them people to [his] house. Never." He then acknowledged that he invited Ms. Jones over multiple times.

On cross-examination, the State noted Defendant had failed to mention two convictions in 2006, one for violation a protective order and one for trespassing, and Defendant acknowledged his altercation with Ms. Jones in 2010 resulted in a conviction for assault that causes bodily injury against a family member. Defendant acknowledged that he told detectives Ms. Jones had told him "we're on our way," but claimed he had no idea why she said "we" in the interview but claimed only she

17

was coming to his house at trial. According to Defendant, Mr. Napoleon was already in Defendant's "store" when he came outside, contrary to telling detectives that Ms. Jones asked him first and he said he did not care if Mr. Napoleon went in the "store."

Defendant stated he never mentioned being on his porch when he shot Mr. Napoleon because he "didn't know it made a difference where [he] was standing at or whatever" until Dr. Welke testified Mr. Napoleon was shot at a downward angle. Defendant continued to claim he had no idea Mr. Napoleon was coming to his house, and answering the State's question of who was selling "weed" with "both of them, maybe." Defendant repeatedly claimed that he loved Ms. Jones and that it hurt him to see her in a wheelchair. He then acknowledged telling his sister that "Crystal got fat" after seeing her testify. Defense counsel called no further witnesses.

## ASSIGNMENT OF ERROR NO. 1:

In his first assignment of error, Defendant contends there is insufficient evidence to support his conviction because the State failed to disprove his claim that he was acting in self-defense.

The State contends that the evidence in the record shows that "[t]he only evidence of self defense put before the jury came from the self-serving testimony of the Defendant, which was refuted by the physical evidence, the testimony of the victim, and the Defendant's own prior statements which were played for the jury."

The analysis for insufficient-evidence claims is well settled:

> When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d 126 (1979), *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to

18

weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

As noted by this court in *State v. F.B.A.*, 07-1526, p. 2 (La.App. 3 Cir. 5/28/08), 983 So.2d 1006, 1009, *writ denied*, 08-1464 (La. 3/27/09), 5 So.3d 138:

Furthermore, the testimony of a single witness is sufficient to support a conviction "[i]n the absence of internal contradiction or irreconcilable conflicts with physical evidence." *State v. Dixon,* 04–1019, p. 12 (La.App. 5 Cir. 3/15/05), 900 So.2d 929, 936. The trier of fact may accept or reject the testimony of any witness, and the determination of the credibility of that witness, in whole or in part, is left to its sound discretion and "will not be re-weighed on appeal." *Id.* at 936.

The supreme court has recently reiterated that:

A homicide is justifiable when it is "committed in self-defense by one who reasonably believes that he is in imminent danger of losing his life or receiving great bodily harm and that the killing is necessary to save himself from that danger." La. R.S. 14:20(A)(1). When justification is raised by the accused, the State must prove beyond a reasonable doubt that the crime was not committed in self-defense.

*State v. Burton*, 19-1079, p. 4 (La. 6/30/21), 320 So.3d 1117, 1120.

On appeal, Defendant does not allege the State failed to prove any element of second-degree murder, only that it failed to disprove his claims of self-defense.

A review of the record shows that these convictions clearly rested entirely on credibility determinations made by the jury after observing firsthand the demeanor of the witnesses and the evidence presented to them.

## *Second Degree Murder Conviction*

Defendant contends, "The facts show he acted in self-defense, which the State failed to carry its burden to disprove." This court disagrees.

This case ultimately presents a credibility call between which witness's testimony the jury chose to believe, Ms. Jones or Defendant. Defendant argues, as he argued at trial, that he killed Mr. Napoleon when he attacked Defendant after telling Defendant he wanted all of Defendant's possessions. On the other hand, Ms. Jones testified Defendant invited her and Mr. Napoleon over to his house to give her money and buy some marijuana, invited her to take the women's jewelry he had in his store, and then shot Mr. Napoleon while he was bending down to pick up some of the jewelry he had dropped. Dr. Welke testified Mr. Napoleon, who Defendant repeatedly stated intimidated him because of his size, was killed by a bullet travelling at a downward trajectory, which supported Ms. Jones's testimony that Mr. Napoleon was bending down when Defendant shot him. Defendant's only explanation was his attempted clarification at trial of his prior inconsistent statement, claiming for the first time that he was standing on his porch when he shot Mr. Napoleon, who was on the ground.

Additionally, Defendant's claim that he was on the porch may explain the downward trajectory of the bullet which hit Mr. Napoleon; however, it fails to explain why Ms. Jones, who was shorter than Mr. Napoleon, was not shot at a downward angle. Defendant's contention that Ms. Jones was only hit because she was near Mr. Napoleon, which this court will explore in detail shortly, would have required the shot that hit Ms. Jones to have been fired in rapid succession, given that Defendant testified Mr. Napoleon was trying to run away either immediately before or after he was shot. In addition, Defendant's claim that he was on his porch was

raised for the first time at trial, and it fails to address the fact that there was a pile of jewelry on the ground just to the side of Defendant's store, as can be seen in State's Exhibit 3. This is particularly noteworthy given that Defendant, in both his initial interview and his trial testimony, also claimed Mr. Napoleon was not carrying any jewelry.

Given the above, this court cannot say the State failed to disprove Defendant's claim of self-defense. The only evidence to support Defendant's claim was his own testimony. Ms. Jones's testimony contradicted nearly every important point of Defendant's claims. Viewing the evidence in the light most favorable to the prosecution, this court finds that any reasonable juror could have believed Ms. Jones's testimony over that of the Defendant and found that the Defendant started shooting at Mr. Napoleon while he was bending down to pick up some of the jewelry. As such, the Defendant's claim of insufficient evidence lacks merit with respect to his claim of self-defense.

For the foregoing reasons, we hold that there was sufficient evidence for the jury to have concluded that Defendant is guilty of second degree murder of Timothy W. Napoleon, and we find this assignment of error to be without merit.

### *Attempted Second Degree Murder Conviction*

"To sustain a conviction for attempted second degree murder, the state must prove that the defendant: (1) intended to kill the victim; and (2) committed an overt act tending toward the accomplishment of the victim's death." *State v. Bishop*, 01-2548, p. 4 (La. 1/14/03), 835 So.2d 434, 437.

Defendant stated on numerous occasions during his interview that he wanted to kill both Mr. Napoleon and Ms. Jones, including a claim that he shot them "as soon as they came out [of his] garage." In addition, in his subsequent telephone

21

conversation, he stated he "wanted both of them motherfxxxers, man." Finally, Mr. Napoleon was shot at a downward angle, but Ms. Jones was not shot at a downward angle.

Furthermore, although both Ms. Jones and Defendant testified at trial that Defendant shot Mr. Napoleon first, during his interview with law enforcement shortly after the shooting, Defendant repeatedly claimed that he shot Ms. Jones first, then Mr. Napoleon. In addition to the numerous times Defendant told law enforcement that he wanted to kill both Mr. Napoleon and Ms. Jones, in his subsequent discussion with his sister he again stated he "wanted both of them motherfxxxers, man."

We find that any reasonable juror could have found the State proved beyond a reasonable doubt that Defendant had the specific intent to kill Ms. Jones and that he shot at both her and Mr. Napoleon intentionally.

Additionally, Defendant's argument that Ms. Jones was shot accidentally fails because of the doctrine of transferred intent. The second circuit has previously noted:

> Under the doctrine of transferred intent, when a person shoots at an intended victim with the specific intent to kill or inflict great bodily harm and accidentally kills or inflicts great bodily harm upon another person, if the killing or infliction of great bodily harm would have been unlawful against the intended victim, then it would be unlawful against the person actually shot even though that person was not the intended victim.

*State v. Brooks*, 42,226, pp. 6-7 (La.App 2 Cir. 8/15/07), 962 So.2d 1220, 1223-24.

This court has previously confirmed the validity of the doctrine of transferred intent:

> The law of transferred intent was explained by our brethren of the first circuit in *State v. Druilhet,* 97–1717 (La.App. 1 Cir. 6/29/98); 716 So.2d 422, a case similar to the case sub judice. In *Druilhet,* the

22

defendant was charged with aggravated battery and, after a trial by jury, was found guilty of the responsive offense of second degree battery. In his claim that the evidence was insufficient to support his conviction, the defendant argued that he lacked the intent necessary for a conviction of second degree battery because he meant to hit his brother and did not mean to hit or cause serious injury to the victim. The court noted that under the theory of transferred intent, if the defendant possessed the necessary intent to inflict serious bodily injury when trying to hit his brother, but missed and accidentally hit someone else instead, such intent is transferred to the actual victim.

*State v. Wright*, 99-1137, p. 11 (La.App. 3 Cir. 3/1/00), 758 So.2d 301, 307, *writ denied*, 00-1614 (La. 3/9/01), 786 So.2d 118.

Furthermore, in *State v. Glover*, 47,311 (La.App. 2 Cir. 10/10/12), 106 So.3d 129, *writ denied*, 12-2667 (La. 5/24/13), 116 So.3d 659, the court applied the doctrine of transferred intent to uphold a conviction for attempted manslaughter when it held the jury could have found the defendant injured innocent bystanders while shooting another individual with whom he had previously quarreled.

In the instant case, Defendant acknowledged his intent to kill Mr. Napoleon, although he later claimed self-defense. Finally, as noted by this court in *State v. Dubroc*, 99-730, p. 6 (La.App. 3 Cir. 12/15/99), 755 So.2d 297, 303, "The law does not require that the intent to kill be of a specific victim, but only that the defendant had the intent to kill someone."

Having already found that there was sufficient evidence to find that the State disproved Defendant's claim of self-defense, the doctrine of transferred intent means that even if the jury believed Defendant had shot Ms. Jones purely by accident, his intent to kill Mr. Napoleon and the act of firing three shots at him would be sufficient to support Defendant's conviction for attempted second degree murder of Ms. Jones.

In view of the foregoing, we find that any reasonable juror could have found the State proved beyond a reasonable doubt that Defendant had the specific intent to

kill Ms. Jones, and that he shot at both her and Mr. Napoleon intentionally and not in self-defense.

For the foregoing reasons, we hold that there was sufficient evidence for the jury to have concluded that Defendant is guilty of attempted of second degree murder of Crystal C. Jones, and we find this assignment of error to be without merit.

### ASSIGNMENT OF ERROR NO. 2:

In his second and final assignment of error, Defendant contends that if this court finds the shooting was not justified, then he should be convicted of the lesser included offenses of manslaughter with regard to Mr. Napoleon and aggravated battery regarding Ms. Jones. Defendant contends the "situation and perceived threat" should have resulted in a finding that his killing of Mr. Napoleon was done in "sudden passion" and "heat of blood," necessitating a manslaughter conviction rather than second degree murder. He combines that claim with his prior claim that there was no intent to kill Ms. Jones to argue that his conviction for attempted second degree murder should have instead been a conviction for aggravated battery.

The jury was necessarily instructed as to the law regarding manslaughter as it was a responsive verdict. Defendant's argument is essentially that all of the factors he argued should have shown justification for the killings should at least lower the verdict to lesser included offenses. However, this court disagrees.

As previously noted, the only evidence presented to support Defendant's version of events, namely that he was caught unaware that Mr. Napoleon was even coming to his house and that Mr. Napoleon subsequently was attempting to rob Defendant, is Defendant's own testimony. Again, Ms. Jones's testimony was that Defendant actually spoke to Mr. Napoleon about bringing some weed to his house, that he invited her to take a bunch of the women's jewelry he had, and that he shot

24

both of them while Mr. Napoleon was bent over trying to pick up jewelry he had dropped.  Her testimony was also corroborated by the pile of jewelry still laying in the grass near where she was shot.

The jury clearly determined it believed Ms. Jones's version of events, not Defendant's, when it returned verdicts of guilty as charged on both counts.  As previously noted, it is not this court's place to reweigh the credibility of witnesses.  Accordingly, we find that a rational trier of fact could find that Defendant did not act under sudden provocation.  As such, we find that this assigned error to be without merit.

## DECREE

For the foregoing reasons, we affirm, in all respects, Defendant's convictions and sentences.

**AFFIRMED.**